## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

TERESA BIERMAN, et al.,

               Plaintiffs,

v.

                                   **MEMORANDUM OF LAW & ORDER**
                                   Civil File No. 14-3021 (MJD/LIB)

GOVERNOR MARK DAYTON,
in his official capacity as Governor
of the State of Minnesota, et al.,

               Defendants.

Aaron B. Solem and William L. Messenger, National Right to Work Legal
Defense Foundation, and Craig S. Krummen, Winthrop & Weinstine, PA,
Counsel for Plaintiffs.

Alan I. Gilbert and Jacob D. Campion, Minnesota Attorney General's Office,
Counsel for Defendants Governor Mark Dayton, Josh Tilsen, and Lucinda Jesson.

Peder J.V. Thoreen and Scott A Kronland, Altshuler Berzon LLP, and Brendan D.
Cummins, and Justin D. Cummins, Cummins & Cummins, PLLP, Counsel for
Defendant SEIU Healthcare Minnesota.

## I.    INTRODUCTION

This matter is before the Court on Plaintiffs' Motion for an Expedited

Preliminary Injunction.  [Docket No. 10]  The Court heard oral argument on

August 19, 2014.  For the reasons that follow, Plaintiffs' motion is denied.

## II.    SUMMARY OF THE DECISION

The Court will not interfere with an ongoing election based on Plaintiffs' fear about what the outcome of that election might be.  Based on a legally enacted Minnesota law, homecare providers have the right to vote in the current secret ballot election to determine whether a majority desire SEIU to be their exclusive representative.  The individual homecare providers are independent actors who will exercise their own free will to decide how to vote.  This Court cannot predict how 27,000 individuals will choose to vote.  Under the law, the election must proceed.

If, after all the votes are counted, the SEIU is certified as the exclusive representative, Plaintiffs may renew their challenge to that certification to this Court.  At this time, their challenge is premature.

## III.    BACKGROUND

### A.    Factual Background

#### 1.    Minnesota's Homecare Program

The State of Minnesota has several programs through which it pays homecare providers to deliver vital "direct support services" to individuals with disabilities or the elderly.  See Minn. Stat. § 256B.0711, subd. 1(b).  These support services include assisting with the "activities of daily living," such as "grooming,

dressing, bathing, transferring, mobility, positioning, eating, and toileting," and the "instrumental activities of daily living," such as "meal planning and preparation; basic assistance with paying bills; shopping for food, clothing, and other essential items . . . and traveling, including to medical appointments and to participate in the community."  Minn. Stat. § 256B.0711, subd. 1(c); § 256B.0659, subd. 1(b), (i).

The recipients of homecare, the participants, have the authority to choose and supervise their own providers; but the Minnesota Commissioner of the Department of Human Services retains the authority to set the economic terms of employment for the individual providers.  Minn. Stat. § 256B.0711, subd. 1(d), subd. 4.  The Commissioner has authority to establish "compensation rates," "payment terms and practices," "benefit terms," "orientation programs," "training and educational opportunities," a "public registry" of individual providers available for work, and "other appropriate terms and conditions of employment governing the workforce of individual providers."  Minn. Stat. § 256B.0711, subd. 4(c).

### 2.    The Public Employment Labor Relations Act

Minnesota's Public Employment Labor Relations Act ("PELRA") gives

public employees "the right by secret ballot to designate an exclusive

representative to negotiate . . . the terms and conditions of employment with

their employer."  Minn. Stat. § 179A.06, subd. 2.  If a union presents the

Commissioner of the Bureau of Mediation Services ("BMS") with a petition

representing that at least 30 percent of the proposed bargaining unit desire

representation by that union, then the union may obtain a certification election.

Minn. Stat. § 179A.12, subd. 3.  If the union then receives a majority of the votes

cast in the certification election, the BMS Commissioner will certify that union as

the exclusive representative of all employees in that bargaining unit.  Id., subd.

10.

Once a union is certified under PELRA, the public employer "has an

obligation to meet and negotiate in good faith with the exclusive representative .

. . regarding . . . the terms and conditions of employment."  Minn. Stat. § 179A.07,

subd. 2.  For state employees, any agreement reached must be presented to the

Minnesota legislature for approval or rejection.  Minn. Stat. § 179A.22, subd. 4.

If a union is certified under PELRA, the employees in the bargaining unit

are not required to become members of the union: PELRA gives employees "the

4

right not to . . . join such organizations" and makes it an "unfair labor practice"

for public employers or employee organizations to "restrain[] or coerce[]"

employees in the exercise of that right.  Minn. Stat. § 179A.06, subd. 2; § 179A.13,

subds. 1, 2(1), 3(1).  Also, the appointment of a PELRA exclusive representative

does

> not affect the right of any public employee or the employee's
> representative to express or communicate a view, grievance,
> complaint, or opinion on any matter related to the conditions or
> compensation of public employment or their betterment, so long as
> this is not designed to and does not interfere with the full faithful
> and proper performance of the duties of employment or circumvent
> the rights of the exclusive representative.

Minn. Stat. § 179A.06, subd. 1.

Under PELRA, unions are permitted, but not required, to assess fair share

fees to non-members.  Minn. Stat. § 179A.06, subd 3.

### 3.     The Individual Providers of Direct Support Services
###         Representation Act

On May 24, 2013, Defendant Governor Mark Dayton signed the Individual

Providers of Direct Support Services Representation Act (the "Act").  2013 Minn.

Law Ch. 128, Art. 2, codified at Minn. Stat. § 179A.54, § 256B.0711.  The Act

provides that, "[f]or the purposes of [PELRA], individual [homecare] providers

shall be considered . . . executive branch state employees. . . .  This section does

not require the treatment of individual providers as public employees for any

other purpose."  Minn. Stat. § 179A.54, subd. 2; see also Minn. Stat. §§ 179A.54,

subd. 1(b); 256B.0711, subd. 1(d).

If an exclusive representative is certified under the procedures set forth in

PELRA, the State and exclusive representative's "mutual rights and obligations .

. . to meet and negotiate regarding terms and conditions shall extend to[:]"

"compensation rates, payment terms and practices, and any benefit terms;"

"required orientation programs;" "relevant training and educational

opportunities;" "the maintenance of a public registry of individuals who have

consented to be included;" and "other appropriate terms and conditions of

employment governing the workforce of individual providers."  Minn. Stat. §

179A.54, subd. 3; § 256B.0711, subd. 4(c).  If a contract results from the

negotiations, it must be approved or disapproved by the legislature.  Minn. Stat.

§ 179A.54, subd. 5; § 256B.0711, subd 4(d).

> No provision of any agreement reached between the state and any
> exclusive representative of individual providers. . . shall interfere
> with the rights of participants or participants' representatives to
> select, hire, direct, supervise, and terminate the employment of their
> individual providers; to manage an individual service budget
> regarding the amounts and types of authorized goods or services
> received; or to receive direct support services from individual
> providers not referred to them through a state registry.

Minn. Stat. § 179A.54, subd. 4.

Any employee organization wishing to represent homecare providers may seek exclusive representative status under PELRA.  Minn. Stat. § 179A.54, subd. 10.  The appropriate unit is defined as "individual providers who have been paid for providing direct support services to participants within the previous 12 months."  Id.

### 4.    The Ongoing Election

In June 2014, Defendant SEIU Healthcare Minnesota ("SEIU") presented over 9,000 union authorization cards signed by homecare providers to BMS seeking to designate SEIU as their exclusive bargaining representative.  (Gulley Decl. ¶ 15.)  On July 8, 2014, SEIU submitted an official petition to BMS requesting an election to certify it as the exclusive representative for Minnesota homecare workers.  (Gulley Decl. ¶ 15.)

On June 30, 2014, the United States Supreme Court issued its decision in Harris v. Quinn, 134 S. Ct. 2618 (2014).  The Court held that it was a violation of the First Amendment for the State of Illinois to require homecare providers to pay fair share fees to a union representative.  Id. at 2644.  After the Harris decision, SEIU informed both BMS and the Commissioner of the Department of

Human Services that it would not require any fair share fee if individual

homecare providers designated it as their exclusive representative.  (Gulley Decl.

¶ 19; Gulley Decl., Ex. A.)  On July 11, BMS mailed notice of the election, the

"Mail Ballot Election Order," to the approximately 27,000 homecare providers

eligible to vote in the election and also posted the Mail Ballot Election Order on

its website.  (Tilsen Aff. ¶ 4.)

On August 1, BMS started a secret-ballot election by mailing ballots to the

26,972 providers who are eligible to vote.  (Gulley Decl. ¶ 16; Solem Decl., Ex. 2,

Mail Ballot Election Order.)  Providers' ballots must be received by BMS by

August 25, 2014.  (Mail Ballot Election Order.)  On August 26, 2014, BMS will

tabulate the ballots and certify the results.  (Mail Ballot Election Order.)  See also

Minn. Stat. § 179A.12, subd. 10.  Then, "[a]ny party to the proceedings may,

within seven days from . . . said certification order . . . file . . . objections to the

certification," which BMS must resolve.  Minn. R. 5505.1400.

### 5.     Plaintiffs

Plaintiffs are nine persons who provide in-home care to a son or daughter

with disabilities in Minnesota.  (See Pls.' Decl. ¶¶ 1-3.)  The family members to

whom Plaintiffs provide care are participants in State Medicaid programs that

pay for in-home care and other services that allow persons with disabilities to

live in their homes instead of in institutions.  (Id. ¶ 3.)  Plaintiffs do not want

SEIU, or any other organization, to be certified as their exclusive representative,

and they do not want the election to proceed.  (Id. ¶ 6.)

### B.    Procedural History

On July 28, 2014, Plaintiffs filed a Complaint in this Court against

Governor Mark Dayton; BMS Commissioner, Josh Tilsen; Commissioner of the

Minnesota Department of Human Services, Lucinda Jesson; and SEIU.  The

Complaint asserts Count I: State certification of an exclusive representati[ve] for

Individual Providers will violate 42 U.S.C. § 1983 and the United States

Constitution; Count II: Subjecting Plaintiffs' First Amendment rights to a

majority vote violates 42 U.S.C. § 1983 and the United States Constitution; and

Count III: Compulsory financial support for an exclusive representative will

violate 42 U.S.C. § 1983 and the United States Constitution.

On July 30, Plaintiffs filed the current Motion for an Expedited Preliminary

Injunction, requesting that the Court enjoin Defendants from implementing or

enforcing the Act.  The motion is based on Counts I and II of the Complaint.

Specifically, Plaintiffs request that the Court enjoin Defendants from conducting

the certification election and from certifying SEIU as the exclusive representative

of Plaintiffs and other individual providers.

## IV.   STANDING AND RIPENESS

### A.   Ripeness

#### 1.   Legal Standard for Ripeness

The ripeness doctrine requires that, before a court may assume jurisdiction

over a case, there must be "a real, substantial controversy between parties having

adverse legal interests, a dispute definite and concrete, not hypothetical or

abstract."  Babbitt v. United Farm Workers Nat'l Union, 442 U.S. 289, 298 (1979)

(citation omitted).  "A claim is not ripe for adjudication if it rests upon contingent

future events that may not occur as anticipated, or indeed may not occur at all."

Minn. Pub. Utils. Comm'n v. F.C.C., 483 F.3d 570, 582 (8th Cir. 2007) (citation

omitted).

> The judicially created doctrine of ripeness flows from both the
> Article III 'cases' and 'controversies' limitations and also from
> prudential considerations for refusing to exercise jurisdiction.
> Ripeness is peculiarly a question of timing and is governed by the
> situation at the time of review, rather than the situation at the time
> of the events under review.  A party seeking review must show both
> the fitness of the issues for judicial decision and the hardship to the
> parties of withholding court consideration.  Both of these factors are
> weighed on a sliding scale, but each must be satisfied to at least a
> minimal degree.

Iowa League of Cities v. E.P.A., 711 F.3d 844, 867 (8th Cir. 2013) (citations

omitted).

"The fitness prong safeguards against judicial review of hypothetical or

speculative disagreements.  The hardship prong asks whether delayed review

inflicts significant practical harm on the plaintiffs."  Parrish v. Dayton, --- F.3d ---

-, 2014 WL 3747601, at *1 (8th Cir. July 31, 2014) (citations omitted).

### 2.    Fitness of the Issues for Judicial Decision

### a)    Count I

The fitness of the issues prong focuses on "a court's ability to visit an issue

[and] whether it would benefit from further factual development."  Pub. Water

Supply Dist. No. 10 v. City of Peculiar, Mo., 345 F.3d 570, 573 (8th Cir. 2003)

(citations omitted).  "The case is more likely to be ripe if it poses a purely legal

question and is not contingent on future possibilities."  Id. (citation omitted).

Count I of the Complaint, based on the claim that certification of an exclusive

representative will violate Plaintiffs' First Amendment rights, rests on an

important future contingency – the outcome of the ongoing election.  Plaintiffs'

motion for a preliminary injunction based on Count I is not fit for judicial review

because a threshold factual element of their claim is uncertain, and factual

development within the next week may obviate the need for the Court to rule at all.

The fact that Plaintiffs feel the need to expend resources to influence the outcome of the election in order to prevent SEIU from prevailing, does not make their claim under Count I ripe:

> The plaintiffs feel burdened fighting to prevent what they view as an unconstitutional collective bargaining agreement.  But many individuals and organizations spend considerable resources fighting to prevent Congress or the state legislatures from adopting legislation that might violate the Constitution.  The courts cannot judge a hypothetical future violation in this case any more than they can judge the validity of a not-yet-enacted law, no matter how likely its passage.  To do so would be to render an advisory opinion, which is precisely what the doctrine of ripeness helps to prevent.

Harris v. Quinn, 656 F.3d 692, 700-01 (7th Cir. 2011) (citation omitted), aff'd in relevant part 134 S. Ct. 2618, 2644 n.30 (2014).

Plaintiffs' motion, to the extent it is based on Count I, is dependent on a future event that "may not occur as anticipated, or indeed may not occur at all." Parrish, 2014 WL 3747601, at *2 (citation omitted).

### b)    Count II

To the extent that Plaintiffs' motion is based on Count II, the claim that the mere holding of an election violates their First Amendment rights, the issue is fit

for judicial decision.  The election is already underway.  There are no relevant

future contingencies that would affect the Court's ability to rule.

### 3.   Hardship to the Parties of Withholding Court Consideration

"A plaintiff who challenges a statute must demonstrate a realistic danger

of sustaining a direct injury as a result of the statute's operation or enforcement."

Babbitt, 442 U.S. at 298.  "The plaintiffs need not wait until the threatened injury

occurs, but the injury must be certainly impending."  Pub. Water Supply Dist.

No. 10 of Cass County, Mo., 345 F.3d at 573 (citation omitted).

### a)   Count I

Plaintiffs face no hardship from this Court's decision to deny review at this

time.  The Act, in and of itself, does not require Plaintiffs to associate with SEIU

in any manner.  The outcome of the election is uncertain and beyond the Court's

power of prediction.  If SEIU does not receive a majority of the votes cast, then

Count I will be moot.  If SEIU does receive a majority of the votes cast, then

Plaintiffs may renew their motion as to Count I, and this Court is fully informed

and equipped to swiftly rule on the merits of such a motion for a preliminary

injunction.  There is no hardship to the parties in withholding court

consideration until after the outcome of the election.

13

**b)      Count II**

As the Court has noted, Plaintiffs' claimed injury in Count II has already

happened based solely on the fact that the certification election is occurring.

Based on Plaintiffs' theory, they will suffer continuing hardship each day that the

Court fails to address their motion and allows the election to continue.

**4.      Conclusion as to Ripeness**

The Court concludes that, to the extent Plaintiffs' motion for a preliminary

injunction is based on Count I of their Complaint, the motion is not ripe and

must be denied.  To the extent Plaintiffs' motion is based on Count II of their

Complaint and the allegation that the mere occurrence of the election violates

their First Amendment rights, their motion is ripe.  The Court now turns to the

question of standing with regard to Count II.

**B.      Standing: Count II**

"To show Article III standing, a plaintiff has the burden of proving: (1) that

he or she suffered an injury-in-fact, (2) a causal relationship between the injury

and the challenged conduct, and (3) that the injury likely will be redressed by a

favorable decision."  <u>S.D. v. U.S. Dept. of Interior</u>, 665 F.3d 986, 989 (8th Cir.

2012) (citations omitted).

Here, Plaintiffs have standing to bring their motion with regard to Count II. There are no remaining contingencies regarding this claim. Plaintiffs claim that they are injured by the mere holding of the election, and the election is already underway. The alleged injury is caused by the continuation of the election. Finally, a favorable decision by this Court, halting the election, would address the alleged injury. The Court now turns to the merits of Plaintiffs' motion for a preliminary injunction based solely on Count II of the Complaint.

## V.   MOTION FOR A PRELIMINARY INJUNCTION

### A.   Standard for a Preliminary Injunction

The Eighth Circuit Court of Appeals has established the standard for considering preliminary injunctions. Dataphase Sys. Inc. v. CL Sys., Inc., 640 F.2d 109, 113 (8th Cir. 1981) (en banc). This Court must consider (1) the threat of irreparable harm to the moving party if an injunction is not granted, (2) the harm suffered by the moving party if injunctive relief is denied as compared to the effect on the non-moving party if the relief is granted, (3) the public interest, and (4) the probability that the moving party will succeed on the merits. Id.

> [A] party seeking a preliminary injunction of the implementation of a state statute must demonstrate more than just a "fair chance" that it will succeed on the merits. We characterize this more rigorous standard, drawn from the traditional test's requirement for showing a likelihood of success on the merits, as requiring a showing that the

15

movant is likely to prevail on the merits.  [A] more rigorous standard reflects the idea that governmental policies implemented through legislation or regulations developed through presumptively reasoned democratic processes are entitled to a higher degree of deference and should not be enjoined lightly.  If the party with the burden of proof makes a threshold showing that it is likely to prevail on the merits, the district court should then proceed to weigh the other <u>Dataphase</u> factors.

<u>Planned Parenthood Minn., N.D., S.D. v. Rounds</u>, 530 F.3d 724, 731-32 (8th Cir. 2008) (en banc) (citations and footnote omitted).  This heightened standard is intended "to ensure that preliminary injunctions that thwart a state's presumptively reasonable democratic processes are pronounced only after an appropriately deferential analysis."  <u>Id.</u> at 733.

### B.    Likelihood of Success of the Merits

The Court concludes that Plaintiffs are not likely to succeed on the merits of their claim in Count II.

The First Amendment guarantees each individual the right to associate for expressive purposes, including a right to associate for purposes of petitioning the government and influencing public policy.  <u>See</u> <u>Citizens Against Rent Control v. City of Berkeley</u>, 454 U.S. 290, 294-95 (1981).  "[P]olitical association is speech in and of itself," because "[i]t allows a person to convey a message about some of his or her basic beliefs through such associations."  <u>Republican Party of Minn. v.</u>

White, 416 F.3d 738, 762 (8th Cir. 2005) (en banc).  And the "[f]reedom of association . . . plainly presupposes a freedom not to associate."  Knox v. Serv. Employees Int'l Union, Local 1000, 132 S. Ct. 2277, 2288 (2012) (citation omitted).

Here, in Count I, Plaintiffs claim that, if SEIU receives the majority of votes in the current election and is certified as the exclusive representative, they will be required to associate with SEIU in violation of their First Amendment rights.  In Count II, Plaintiffs argue that, regardless of the outcome, the ongoing certification election is, itself, unconstitutional because the election allows the possibility that the majority will impose their will on the minority and force them to associate with SEIU.  They assert that, for the State to put to a majority vote each Plaintiff's individual right to choose which organization he or she picks to lobby the government is antithetical to the First Amendment freedom of association.

The Court finds no support for Plaintiffs' assertion that their constitutional rights are violated by the mere fact that a vote is occurring, which may or may not result in an action that Plaintiffs claim would violate their constitutional rights.  Legislative bodies often vote on measures that, if adopted by the majority, might violate the First Amendment; in many states, citizens also vote

on such measures.  However, there is no legal authority for the proposition that

merely holding a vote on such a measure that may violate the First Amendment

is, in and of itself, a violation of the First Amendment.  Were the law otherwise,

federal courts would be full of cases seeking to prevent votes on such measures.

As the Supreme Court noted in <u>Clapper v. Amnesty Int'l USA</u>, the mere fact that

Plaintiffs feel compelled to expend energy and resources to attempt to prevent a

harm that may occur – certification of SEIU – does not allow them to

manufacture a current injury.  133 S. Ct. 1138, 1151 (2013).  The Court concludes

that Plaintiffs cannot show a likelihood of success on their claim that the holding

of the certification election violates their First Amendment rights.

## C.    Remaining <u>Dataphase</u> Factors

Because Plaintiffs cannot show a likelihood of success on the merits of

their First Amendment claim in Count II, no presumption of irreparable harm

follows.  <u>See, e.g.</u>, <u>Educ. Minn. Lakeville v. Indep. Sch. Dist. No. 194</u>, 341 F. Supp.

2d 1070, 1080 (D. Minn. 2004) ("Under the Eighth Circuit's interpretation of

<u>Elrod</u>, irreparable harm exists '[i]f [the plaintiffs] <u>are correct and their First</u>

<u>Amendment rights have been violated</u>.'") (emphasis in original) (quoting <u>Marcus</u>

<u>v. Iowa Public Television</u>, 97 F.3d 1137, 1140–41 (8th Cir. 1996)).  Additionally,

because Plaintiffs have failed to show a likelihood of success on the merits of

their claim under Count II, the Court need not address the remaining <u>Dataphase</u>

factors.  <u>See</u> <u>Planned Parenthood Minn., N.D., S.D. v. Rounds</u>, 530 F.3d 724, 737

(8th Cir. 2008).

Accordingly, based upon the files, records, and proceedings herein**, IT IS**

**HEREBY ORDERED**:

Plaintiffs' Motion for an Expedited Preliminary Injunction [Docket
No. 10] is **DENIED**.


Dated:   August 20, 2014             <u>s/ Michael J. Davis</u>
                                     Michael J. Davis
                                     Chief Judge
                                     United States District Court