# NITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

---

TERESA BIERMAN, et al.,

        Plaintiffs,


v.

GOVERNOR MARK DAYTON,
in his official capacity as Governor
of the State of Minnesota, et al.,

        Defendants.

**MEMORANDUM OF LAW & ORDER**
Civil File No. 14-3021 (MJD/LIB)

---

Aaron B. Solem and William L. Messenger, National Right to Work Legal
Defense Foundation, and Craig S. Krummen, Winthrop & Weinstine, PA,
Counsel for Plaintiffs.

Alan I. Gilbert and Jacob D. Campion, Minnesota Attorney General's Office,
Counsel for Defendants Governor Mark Dayton, Josh Tilsen, and Lucinda Jesson.

Peder J.V. Thoreen and Scott A. Kronland, Altshuler Berzon LLP, and Brendan
D. Cummins and Justin D. Cummins, Cummins & Cummins, PLLP, Counsel for
Defendant SEIU Healthcare Minnesota.

---

## I.   INTRODUCTION

This matter is before the Court on Plaintiffs' Motion to Renew Their

Motion for an Expedited Preliminary Injunction.  [Docket No. 52]  Because

Plaintiffs are unlikely to succeed on the merits of their claim, their motion is denied.

## II.      SUMMARY OF THE DECISION

The State of Minnesota has made a policy decision that it wishes to hear from and negotiate with an exclusive representative of homecare providers.  A secret ballot election was held in which the majority of homecare providers voted to certify SEIU as that exclusive representative.  SEIU was chosen based on majority vote, a long-held bedrock principle of American government.  Plaintiffs represent that they have no objection to the State exclusively conferring with SEIU on Medicaid policy and excluding Plaintiffs from that discussion.  Plaintiffs are not required to join SEIU.  They are not required to financially support SEIU. They may petition the State individually or in other groups regarding Medicaid policy.  They may express their disagreement with SEIU to the State, to the public, and to anyone else.  There is simply no infringement on Plaintiffs' First Amendment rights.

## III.     BACKGROUND

### A.      Factual Background

### 1.     Minnesota's Homecare Program

The State of Minnesota has several programs through which it pays homecare providers to deliver vital "direct support services" to individuals with disabilities or the elderly.  See Minn. Stat. § 256B.0711, subd. 1(b).  These support services include assisting with the "activities of daily living," such as "grooming, dressing, bathing, transferring, mobility, positioning, eating, and toileting," and the "instrumental activities of daily living," such as "meal planning and preparation; basic assistance with paying bills; shopping for food, clothing, and other essential items . . . and traveling, including to medical appointments and to participate in the community."  Minn. Stat. § 256B.0711, subd. 1(c); § 256B.0659, subd. 1(b), (i).

The recipients of homecare, the participants, have the authority to choose and supervise their own providers; but the Minnesota Commissioner of the Department of Human Services ("DHS") retains the authority to set the economic terms of employment for the individual providers.  Minn. Stat. § 256B.0711, subd. 1(d), subd. 4.  The Commissioner has authority to establish "compensation rates," "payment terms and practices," "benefit terms," "orientation programs," "training and educational opportunities," a "public registry" of individual providers available for work, and "other appropriate terms and conditions of

employment governing the workforce of individual providers."  Minn. Stat. §

256B.0711, subd. 4(c).

### 2.     The Public Employment Labor Relations Act

Minnesota's Public Employment Labor Relations Act ("PELRA") gives

public employees "the right by secret ballot to designate an exclusive

representative to negotiate . . . the terms and conditions of employment with

their employer."  Minn. Stat. § 179A.06, subd. 2.  If a union presents the

Commissioner of the Bureau of Mediation Services ("BMS") with a petition

representing that at least 30 percent of the proposed bargaining unit desire

representation by that union, then the union may obtain a certification election.

Minn. Stat. § 179A.12, subd. 3.  If the union then receives a majority of the votes

cast in the certification election, the BMS Commissioner will certify that union as

the exclusive representative of all employees in that bargaining unit.  Id., subd.

10.

Once a union is certified under PELRA, the public employer "has an

obligation to meet and negotiate in good faith with the exclusive representative .

. . regarding . . . the terms and conditions of employment."  Minn. Stat. § 179A.07,

subd. 2.  For state employees, any agreement reached must be presented to the

Minnesota legislature for approval or rejection.  Minn. Stat. § 179A.22, subd. 4.

If a union is certified under PELRA, the employees in the bargaining unit

are not required to become members of the union: PELRA gives employees "the

right not to . . . join such organizations" and makes it an "unfair labor practice"

for public employers or employee organizations to "restrain[] or coerce[]"

employees in the exercise of that right.  Minn. Stat. § 179A.06, subd. 2; § 179A.13,

subds. 1, 2(1), 3(1).  Also, the appointment of a PELRA exclusive representative

does

> not affect the right of any public employee or the employee's
> representative to express or communicate a view, grievance,
> complaint, or opinion on any matter related to the conditions or
> compensation of public employment or their betterment, so long as
> this is not designed to and does not interfere with the full faithful
> and proper performance of the duties of employment or circumvent
> the rights of the exclusive representative.

Minn. Stat. § 179A.06, subd. 1.

Under PELRA, unions are permitted, but not required, to assess fair share

fees to non-members.  Minn. Stat. § 179A.06, subd 3.

5

### 3.     The Individual Providers of Direct Support Services Representation Act

On May 24, 2013, Defendant Governor Mark Dayton signed the Individual

Providers of Direct Support Services Representation Act (the "Act").  2013 Minn.

Law Ch. 128, Art. 2, codified at Minn. Stat. §§ 179A.54, 256B.0711.  The Act

provides that, "[f]or the purposes of [PELRA], individual [homecare] providers

shall be considered . . . executive branch state employees. . . .  This section does

not require the treatment of individual providers as public employees for any

other purpose."  Minn. Stat. § 179A.54, subd. 2; see also Minn. Stat. §§ 179A.54,

subd. 1(b); 256B.0711, subd. 1(d).

If an exclusive representative is certified under the procedures set forth in

PELRA, the State and exclusive representative's "mutual rights and obligations .

. . to meet and negotiate regarding terms and conditions shall extend to[:]"

"compensation rates, payment terms and practices, and any benefit terms;"

"required orientation programs;" "relevant training and educational

opportunities;" "the maintenance of a public registry of individuals who have

consented to be included;" and "other appropriate terms and conditions of

employment governing the workforce of individual providers."  Minn. Stat. §

179A.54, subd. 3; § 256B.0711, subd. 4(c).  If a contract results from the

negotiations, it must be approved or disapproved by the legislature.  Minn. Stat.

§ 179A.54, subd. 5; § 256B.0711, subd 4(d).

> No provision of any agreement reached between the state and any
> exclusive representative of individual providers. . . shall interfere
> with the rights of participants or participants' representatives to
> select, hire, direct, supervise, and terminate the employment of their
> individual providers; to manage an individual service budget
> regarding the amounts and types of authorized goods or services
> received; or to receive direct support services from individual
> providers not referred to them through a state registry.

Minn. Stat. § 179A.54, subd. 4.

Any employee organization wishing to represent homecare providers may

seek exclusive representative status under PELRA.  Minn. Stat. § 179A.54, subd.

10.  The appropriate unit is defined as "individual providers who have been paid

for providing direct support services to participants within the previous 12

months."  Id.

### 4.   The Election

In June 2014, Defendant SEIU Healthcare Minnesota ("SEIU") presented

over 9,000 union authorization cards signed by homecare providers to BMS

seeking to designate SEIU as their exclusive bargaining representative.  (Gulley

Decl. ¶ 15.)  On July 8, 2014, SEIU submitted an official petition to BMS

7

requesting an election to certify it as the exclusive representative for Minnesota homecare workers.  (Id.)

On June 30, 2014, the United States Supreme Court issued its decision in Harris v. Quinn, 134 S. Ct. 2618 (2014).  The Court held that it was a violation of the First Amendment for the State of Illinois to require homecare providers to pay fair share fees to a union representative.  Id. at 2644.  After the Harris decision, SEIU informed both BMS and DHS that it would not require any fair share fee if individual homecare providers designated it as their exclusive representative.  (Gulley Decl. ¶ 19; Gulley Decl., Ex. A.)  On July 11, BMS mailed notice of the election, the "Mail Ballot Election Order," to the approximately 27,000 homecare providers eligible to vote in the election and also posted the Mail Ballot Election Order on its website.  (Tilsen Aff. ¶ 4.)

On August 1, BMS started a secret-ballot election by mailing ballots to the 26,972 providers who are eligible to vote.  (Gulley Decl. ¶ 16; Solem Decl., Ex. 2, Mail Ballot Election Order.)  On August 26, 2014, BMS tabulated the ballots and certified SEIU as the exclusive representative.  ([Docket No. 52-1] BMS Certification of Exclusive Representative.)  See also Minn. Stat. § 179A.12, subd. 10.

### 5.   Plaintiffs

Plaintiffs are nine persons who provide in-home care to a son or daughter with disabilities in Minnesota.  (See Pls.' Decl. ¶¶ 1-3.)  The family members to whom Plaintiffs provide care are participants in State Medicaid programs that pay for in-home care and other services that allow persons with disabilities to live in their homes instead of in institutions.  (Id. ¶ 3.)  Plaintiffs do not want SEIU to be their certified exclusive representative.  (Id. ¶ 6.)  (See also Am. Compl. ¶¶ 4-13, 33.)

### B.   Procedural History

On July 28, 2014, Plaintiffs filed a Complaint in this Court against Governor Mark Dayton; BMS Commissioner Josh Tilsen; DHS Commissioner Lucinda Jesson; and SEIU.  The Complaint asserted Count I: State certification of an exclusive representati[ve] for Individual Providers will violate 42 U.S.C. § 1983 and the United States Constitution; Count II: Subjecting Plaintiffs' First Amendment rights to a majority vote violates 42 U.S.C. § 1983 and the United States Constitution; and Count III: Compulsory financial support for an exclusive representative will violate 42 U.S.C. § 1983 and the United States Constitution.

On July 30, Plaintiffs filed a Motion for an Expedited Preliminary Injunction, requesting that the Court enjoin Defendants from implementing or

enforcing the Act.  The motion was based on Counts I and II of the Complaint.

Specifically, Plaintiffs requested that the Court enjoin Defendants from

conducting the certification election and from certifying SEIU as the exclusive

representative of Plaintiffs and other individual providers.  On August 20, this

Court issued an Order denying Plaintiffs' motion.  [Docket No. 50]  The Court

denied the motion as to Count I because the claim was unripe and premature.

The Court denied the motion as to Count II on the merits.

On August 26, 2014, BMS tabulated the election results and certified SEIU

as the exclusive representative.  On September 2, Plaintiffs filed an Amended

Complaint against the same Defendants, asserting: Count I: State certification of

an exclusive representati[ve] for individual providers will violate 42 U.S.C. §

1983 and the United States Constitution; and Count II: Subjecting Plaintiffs' First

Amendment rights to a majority vote violates 42 U.S.C. § 1983 and the United

States Constitution.  On August 27, Plaintiffs' filed a Motion to Renew Their

Motion for an Expedited Preliminary Injunction based solely on Count I of the

Amended Complaint.  [Docket No. 52]  No oral argument was requested.

## IV.   STANDING AND RIPENESS

### A.    Standing

"To show Article III standing, a plaintiff has the burden of proving: (1) that he or she suffered an injury-in-fact, (2) a causal relationship between the injury and the challenged conduct, and (3) that the injury likely will be redressed by a favorable decision." <u>S.D. v. U.S. Dept. of Interior</u>, 665 F.3d 986, 989 (8th Cir. 2012) (citations omitted).  The State Defendants argue that Plaintiffs lack standing because the outcome of future negotiations between SEIU and the State is unknown.

Here, Plaintiffs have standing to bring their motion with regard to Count I. There are no remaining material contingencies regarding this claim.  Plaintiffs claim that they are injured by the fact that SEIU has been certified as the exclusive representative for their bargaining unit.  The alleged injury to their First Amendment freedom of association is caused by the State's certification. Finally, a favorable decision by this Court, barring certification would address the alleged injury.

### B.    Ripeness

The State Defendants assert that Plaintiffs' claim is not ripe for review because it depends upon future contingencies such as the result of negotiations between SEIU and the State, whether such a negotiated agreement would be

approved by the legislature, and whether the terms of the agreement would harm Plaintiffs.

### 1.    Legal Standard for Ripeness

The ripeness doctrine requires that, before a court may assume jurisdiction over a case, there must be "a real, substantial controversy between parties having adverse legal interests, a dispute definite and concrete, not hypothetical or abstract." Babbitt v. United Farm Workers Nat'l Union, 442 U.S. 289, 298 (1979) (citation omitted). "A claim is not ripe for adjudication if it rests upon contingent future events that may not occur as anticipated, or indeed may not occur at all." Minn. Pub. Utils. Comm'n v. F.C.C., 483 F.3d 570, 582 (8th Cir. 2007) (citation omitted).

> The judicially created doctrine of ripeness flows from both the Article III 'cases' and 'controversies' limitations and also from prudential considerations for refusing to exercise jurisdiction. Ripeness is peculiarly a question of timing and is governed by the situation at the time of review, rather than the situation at the time of the events under review. A party seeking review must show both the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration. Both of these factors are weighed on a sliding scale, but each must be satisfied to at least a minimal degree.

Iowa League of Cities v. E.P.A., 711 F.3d 844, 867 (8th Cir. 2013) (citations omitted).

"The fitness prong safeguards against judicial review of hypothetical or speculative disagreements.  The hardship prong asks whether delayed review inflicts significant practical harm on the plaintiffs."  <u>Parrish v. Dayton</u>, --- F.3d --- -, 2014 WL 3747601, at *1 (8th Cir. July 31, 2014) (citations omitted).

### 2.    Fitness of the Issues for Judicial Decision

The fitness of the issues prong focuses on "a court's ability to visit an issue [and] whether it would benefit from further factual development."  <u>Pub. Water Supply Dist. No. 10 v. City of Peculiar, Mo.</u>, 345 F.3d 570, 573 (8th Cir. 2003) (citations omitted).  "The case is more likely to be ripe if it poses a purely legal question and is not contingent on future possibilities."  <u>Id.</u> (citation omitted).

Count I of the Complaint is based on Plaintiffs' claim that certification of an exclusive representative, in and of itself, violates Plaintiffs' First Amendment rights.  Their claim is not based on the favorability or unfavorability of the terms of any potential contract negotiated by the SEIU.  Therefore, Count I no longer rests on a key future contingency – the outcome of the election is known.  SEIU has been certified as the exclusive representative.

### 3.      Hardship to the Parties of Withholding Court Consideration

"A plaintiff who challenges a statute must demonstrate a realistic danger of sustaining a direct injury as a result of the statute's operation or enforcement." Babbitt, 442 U.S. at 298.  "The plaintiffs need not wait until the threatened injury occurs, but the injury must be certainly impending."  Pub. Water Supply Dist. No. 10 of Cass County, Mo., 345 F.3d at 573 (citation omitted).

Plaintiffs' claimed injury in Count I has now happened: SEIU has won the majority of votes in the election and has been certified as the exclusive representative.  Based on Plaintiffs' theory, they now suffer a continuing hardship each day that the SEIU remains certified as the exclusive representative.

The Court concludes that Plaintiffs' motion based on Count I is ripe for review.  The Court now turns to the merits of Plaintiffs' motion for a preliminary injunction based on Count I of the Complaint.

## V.      MOTION FOR A PRELIMINARY INJUNCTION

### A.      Standard for a Preliminary Injunction

The Eighth Circuit Court of Appeals has established the standard for considering preliminary injunctions.  Dataphase Sys. Inc. v. CL Sys., Inc., 640 F.2d 109, 113 (8th Cir. 1981) (en banc ).  This Court must consider (1) the threat of irreparable harm to the moving party if an injunction is not granted, (2) the harm

14

suffered by the moving party if injunctive relief is denied as compared to the

effect on the non-moving party if the relief is granted, (3) the public interest, and

(4) the probability that the moving party will succeed on the merits.  Id.

> [A] party seeking a preliminary injunction of the implementation of a state statute must demonstrate more than just a "fair chance" that it will succeed on the merits.  We characterize this more rigorous standard, drawn from the traditional test's requirement for showing a likelihood of success on the merits, as requiring a showing that the movant is likely to prevail on the merits.  [A] more rigorous standard reflects the idea that governmental policies implemented through legislation or regulations developed through presumptively reasoned democratic processes are entitled to a higher degree of deference and should not be enjoined lightly.  If the party with the burden of proof makes a threshold showing that it is likely to prevail on the merits, the district court should then proceed to weigh the other Dataphase factors.

Planned Parenthood Minn., N.D., S.D. v. Rounds, 530 F.3d 724, 731-32 (8th Cir.

2008) (en banc) (citations and footnote omitted).  This heightened standard is

intended "to ensure that preliminary injunctions that thwart a state's

presumptively reasonable democratic processes are pronounced only after an

appropriately deferential analysis."  Id. at 733.

### B.    Likelihood of Success of the Merits

The Court concludes that Plaintiffs are not likely to succeed on the merits

of their claim under Count I.

1.   **Whether Certification of an Exclusive Representative, Absent Fair Share Fees, Infringes Plaintiffs' First Amendment Right to Association to Petition the Government**

   a)   **The Right Not to Associate**

The First Amendment guarantees each individual the right to associate for expressive purposes, including a right to associate for purposes of petitioning the government and influencing public policy.  See Citizens Against Rent Control v. City of Berkeley, 454 U.S. 290, 294-95 (1981).  "[P]olitical association is speech in and of itself," because "[i]t allows a person to convey a message about some of his or her basic beliefs."  Republican Party of Minn. v. White, 416 F.3d 738, 762 (8th Cir. 2005) (en banc).  And the "[f]reedom of association . . . plainly presupposes a freedom not to associate."  Knox v. Serv. Employees Int'l Union, Local 1000, 132 S. Ct. 2277, 2288 (2012) (citation omitted).

   b)   **Whether Exclusive Representation Compels Association**

Plaintiffs assert that State certification of an exclusive representative for homecare providers affiliates Plaintiffs with SEIU's petitioning, speech, and policy positions.

Although SEIU has been certified as the exclusive representative, Plaintiffs are not forced to associate with SEIU.  They are not required to join SEIU.  See

Minn. Stat. § 179A.06, subd. 2.  They will not be forced to financially contribute to

SEIU.  They remain free to petition the State on all issues related to the homecare

programs and to vociferously criticize SEIU.  See Minn. Stat. § 179A.06, subd. 1;

Minn. Stat. § 179A.54, subd. 2.

Simply because the State has chosen to listen to SEIU on issues that are

related to Plaintiffs' employment does not mean that Plaintiffs are being forced

to associate with SEIU.  Instead, as the Supreme Court recognized in Minnesota

State Board for Community Colleges v. Knight, the State of "Minnesota has

simply restricted the class of persons to whom it will listen in its making of

policy."  465 U.S. 271, 282 (1984).  In this case, the State has chosen to listen to the

entity that received the majority of votes in a secret-ballot election of all

individual homecare providers.  Plaintiffs are not forced to associate with SEIU

in any way, and they "have no constitutional right to force the government to

listen to their views.  They have no such right as members of the public [or] as

government employees. . . ."  Id. at 283.  "A person's right to speak is not

infringed when government simply ignores that person while listening to

others."  Id. at 288 (footnote omitted).  The Supreme Court has expressly stated

that the amplification of the exclusive representative's voice through its "unique"

role in both the meet and confer and the meet and negotiate sessions does not

impair the nonmembers' First Amendment rights.  Id.  As in Knight, Plaintiffs'

associational freedom is not impaired because they can "form whatever

advocacy groups they like" and are "not required to become members" of SEIU.

Id. at 289.

The very system by which bargaining unit members select a PELRA

exclusive representative through majority vote makes clear that not all

bargaining unit members necessarily support the representative's positions.  See

Knight, 465 U.S. at 276 ("The State Board considers the views expressed by the

state-wide faculty 'meet and confer' committees to be the faculty's official

collective position.  It recognizes, however, that not every instructor agrees with

the official faculty view on every policy question.") (addressing PELRA).  Not

only does the Act itself permit Plaintiffs to voice opinions directly to the State,

but also, established Supreme Court precedent holds that bargaining unit

members are free to criticize the positions of their union representative and make

clear that they disagree with its positions.  See Abood v. Detroit Bd. of Educ., 431

U.S. 209, 230 (1977); City of Madison, Joint Sch. Dist. No. 8 v. Wis. Employment

Relations Comm'n, 429 U.S. 167, 176 n.10 (1976).  There is no violation of

Plaintiffs' First Amendment associational rights when they "are free to associate to voice their disapproval of [SEIU's] message; nothing about the statute affects the composition of [any group formed by Plaintiffs] by making group membership less desirable." Rumsfeld v. Forum for Academic & Institutional Rights, Inc., 547 U.S. 47, 69-70 (2006). Nor does Mulhall v. UNITE HERE Local 355 require a different conclusion. 618 F.3d 1279, 1287 (11th Cir. 2010). Mulhall only addressed standing, not the merits of the employee's claim, and only addressed a Labor Management Relations Act claim, not a First Amendment claim. Id. at 1286.

The Court is also mindful of its role as a federal court being asked to interfere with a state's policy decision of how to gather information in order to make Medicaid policy. The Supreme Court recognized the "federalism and separation-of-powers concerns [that] would be implicated in the massive intrusion into state . . . policymaking that recognition of the claimed right [to be listened to by the government] would entail." Knight, 465 U.S. at 285.

Despite Plaintiffs' insistence, cases such as Hurley v. Irish-American Gay, Lesbian & Bisexual Grp. have no application here. 515 U.S. 557, 560 (1995). Hurley involved state action forcing a private party to alter its expressive activity

to include a viewpoint with which it disagreed.  It is beyond dispute that, if

Plaintiffs formed a parade to protest the State's Medicaid policies, the State could

not force them to include SEIU as a sign-waving parade participant.  But, here,

the State does not require Plaintiffs to allow SEIU to participate in Plaintiffs' own

speech or other expressive activity.  Plaintiffs are free to speak to and petition the

State on all issues, whether individually or as part of some group other than

SEIU.  And the State is not requiring Plaintiffs to join SEIU, financially support

SEIU, or otherwise associate with SEIU as a condition of continuing their

relationship with the State.  Cf. O'Hare Truck Serv., Inc. v. City of Northlake, 518

U.S. 712, 716, 726 (1996) (addressing whether termination of a government

contractor based on its refusal to actively politically support election campaign

violated the First Amendment); Elrod v. Burns, 427 U.S. 347, 355-56, 373 (1976)

(addressing whether political patronage dismissals violated freedom of

association when plaintiffs were fired from their jobs unless they took active

steps to support the victorious political party; they "were required to pledge

their political allegiance to the Democratic Party, work for the election of other

candidates of the Democratic Party, contribute a portion of their wages to the

Party, or obtain the sponsorship of a member of the Party, usually at the price of one of the first three alternatives").

Additionally, the fact that, because it has been certified, SEIU owes a fiduciary-like duty to Plaintiffs "fairly and equitably to represent all employees . . ., union and non-union, within the relevant unit," Abood, 431 U.S. at 221, in no way infringes Plaintiffs' rights.  Plaintiffs owe no corresponding duty to SEIU. Plaintiffs cite no authority for the proposition that the imposition of a legal duty on an entity impermissibly burdens the rights of the beneficiaries of that duty.  In any event, the duty of fair representation imposed on the union actually protects bargaining unit members' rights not to associate with the union.  It bars the union from discriminating against them when bargaining and administering a collective bargaining agreement.  See, e.g., Lehnert v. Ferris Faculty Ass'n, 500 U.S. 507, 556 (1991) (Scalia, J., concurring in part and dissenting in part).

Finally, the Court holds that Harris v. Quinn has no application in this case.  134 S. Ct. 2618 (2014).  In Harris, the plaintiffs did not "challenge the authority of the SEIU–HII to serve as the exclusive representative of all the personal assistants in bargaining with the State.  All they s[ought] is the right not to be forced to contribute to the union, with which they broadly disagree."  134 S.

Ct. at 2640.  The Supreme Court solely decided that it was a violation of the First

Amendment for a state to require homecare providers to pay fair share or agency

fees to a union.  Id. at 2644.  The Harris Court further made clear that a "union's

status as exclusive bargaining agent and the right to collect an agency fee from

non-members are not inextricably linked."  Id. at 2640.  Harris does not dictate a

finding for Plaintiffs by this Court.

The Court concludes that Plaintiffs are unlikely to prove that the State's

certification of SEIU as the exclusive representative under the Act and PELRA

infringes on Plaintiffs' First Amendment rights.

## 2.      Government Interest

Because the Court concludes that the State's certification of SEIU does not

infringe on Plaintiffs' First Amendment rights, the State does not need to

demonstrate a compelling interest.  In fact, the State "need not demonstrate any

special justification to sustain the constitutionality" of the Act.  Univ. of Pa. v.

EEOC, 493 U.S. 182, 201 (1990).

At this early stage, the State has certainly demonstrated a rational basis for

its desire to negotiate with one entity that represents the majority of homecare

providers.  Not only is this system logistically more efficient for the State and

could rationally be believed to be an effective manner to determine the concerns of most homecare providers, but also the State has provided the sworn statement of Charles E. Johnson, DHS Deputy Commissioner for Policy and Operations, as setting forth a rational basis for the State's opinion that the Act and certification of an exclusive representative will improve the relevant programs.  (See Johnson Aff. ¶¶ 6-8, 10-11.)

## C.    Remaining Dataphase Factors

Because Plaintiffs have failed to show a likelihood of success on the merits of their claim under Count I, the Court need not address the remaining Dataphase factors.  See Planned Parenthood Minn., N.D., S.D. v. Rounds, 530 F.3d 724, 737 (8th Cir. 2008).  In any case, because Plaintiffs cannot show a likelihood of success on the merits of their First Amendment claim, no presumption of irreparable harm follows.  See, e.g., Educ. Minn. Lakeville v. Indep. Sch. Dist. No. 194, 341 F. Supp. 2d 1070, 1080 (D. Minn. 2004) ("Under the Eighth Circuit's interpretation of Elrod, irreparable harm exists '[i]f [the plaintiffs] are correct and their First Amendment rights have been violated.'") (emphasis in original) (quoting Marcus v. Iowa Pub. Television, 97 F.3d 1137, 1140–41 (8th Cir. 1996)).  Plaintiffs have set forth no clear theory of irreparable harm.  Under no circumstances will they be required to join a union or

financially support a union.  Their individual rights to speak and associate will not be restricted.  No irreparable harm has been shown.

Because there is no threat of irreparable harm, the balance of the harms weighs against an injunction, as well.

An injunction would delay implementation of legislation passed by the State's properly-elected legislative representatives after full debate and would constitute an unwarranted intrusion of the federal government into the state's affairs and by the judiciary into the policy decisions of the legislative branch. Such an action would not be in the public interest when the Minnesota legislature has made a policy decision, after full consideration and debate, that bringing individual homecare providers under PELRA would benefit Minnesota's homecare programs.  The public has a strong interest in improving the homecare program by reducing turnover, attracting more qualified providers and, ultimately, enabling better home-based care to individuals with disabilities and the elderly.

Accordingly, based upon the files, records, and proceedings herein**, IT IS HEREBY ORDERED**:

Plaintiffs' Motion to Renew Their Motion for an Expedited
Preliminary Injunction [Docket No. 52] is **DENIED**.


Dated:   October 21, 2014                   s/ Michael J. Davis
                                            Michael J. Davis
                                            Chief Judge
                                            United States District Court