# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

TERESA BIERMAN, et al.,

        Plaintiffs,

v.

GOVERNOR MARK DAYTON,
in his official capacity as Governor
of the State of Minnesota, et al.,

        Defendants.

**MEMORANDUM OF LAW & ORDER**
Civil File No. 14-3021 (MJD/LIB)

Aaron B. Solem and William L. Messenger, National Right to Work Legal Defense Foundation, and Craig S. Krummen, Winthrop & Weinstine, PA, Counsel for Plaintiffs.

Alan I. Gilbert and Jacob D. Campion, Minnesota Attorney General's Office, Counsel for Defendants Governor Mark Dayton, Josh Tilsen, and Emily Johnson Piper.

Peder J.V. Thoreen and Scott A. Kronland, Altshuler Berzon LLP, and Brendan D. Cummins and Justin D. Cummins, Cummins & Cummins, PLLP, Counsel for Defendant SEIU Healthcare Minnesota.

## I. INTRODUCTION

This matter is before the Court on State Defendants' Motion for Judgment

on the Pleadings [Docket No. 88] and Defendant SEIU Healthcare Minnesota's

Motion for Judgment on the Pleadings [Docket No. 92].  Because Minnesota's

certification of SEIU did not infringe on Plaintiffs' First Amendment rights,

Defendants' motions are granted.

## II.   BACKGROUND

### A.   Factual Background

#### 1.   Minnesota's Homecare Program

The State of Minnesota has several programs through which it pays

homecare providers to deliver vital "direct support services" to individuals with

disabilities or the elderly.  See Minn. Stat. § 256B.0711, subd. 1(b).  These support

services include assisting with the "activities of daily living," such as "grooming,

dressing, bathing, transferring, mobility, positioning, eating, and toileting," and

the "instrumental activities of daily living," such as "meal planning and

preparation; basic assistance with paying bills; shopping for food, clothing, and

other essential items . . . and traveling, including to medical appointments and to

participate in the community."  Minn. Stat. § 256B.0711, subd. 1(c); § 256B.0659,

subd. 1(b), (i).

The recipients of homecare, the participants, have the authority to choose

and supervise their own providers; but the Minnesota Commissioner of the

Department of Human Services ("DHS") retains the authority to set the economic

terms of employment for the individual providers.  Minn. Stat. § 256B.0711, subd.

1(d), subd. 4.  The Commissioner has authority to establish "compensation

rates," "payment terms and practices," "benefit terms," "orientation programs,"

"training and educational opportunities," a "public registry" of individual

providers available for work, and "other appropriate terms and conditions of

employment governing the workforce of individual providers."  Minn. Stat. §

256B.0711, subd. 4(c).

### 2.      The Public Employment Labor Relations Act

Minnesota's Public Employment Labor Relations Act ("PELRA") gives

public employees "the right by secret ballot to designate an exclusive

representative to negotiate . . . the terms and conditions of employment with

their employer."  Minn. Stat. § 179A.06, subd. 2.  If a union presents the

Commissioner of the Bureau of Mediation Services ("BMS") with a petition

representing that at least 30 percent of the proposed bargaining unit desire

representation by that union, then the union may obtain a certification election.

Minn. Stat. § 179A.12, subd. 3.  If the union then receives a majority of the votes

cast in the certification election, the BMS Commissioner will certify that union as

the exclusive representative of all employees in that bargaining unit.  Id., subd. 10.

Once a union is certified under PELRA, the public employer "has an obligation to meet and negotiate in good faith with the exclusive representative . . . regarding . . . the terms and conditions of employment."  Minn. Stat. § 179A.07, subd. 2.  For state employees, any agreement reached must be presented to the Minnesota legislature for approval or rejection.  Minn. Stat. § 179A.22, subd. 4.

If a union is certified under PELRA, the employees in the bargaining unit are not required to become members of the union: PELRA gives employees "the right not to . . . join such organizations" and makes it an "unfair labor practice" for public employers or employee organizations to "restrain[] or coerce[]" employees in the exercise of that right or for public employers to "discriminat[e] in regard to hire or tenure to encourage or discourage membership in an employee organization."  Minn. Stat. § 179A.06, subd. 2; § 179A.13, subds. 1, 2(1), 2(3), 3(1).  Also, the appointment of a PELRA exclusive representative does

> not affect the right of any public employee or the employee's representative to express or communicate a view, grievance, complaint, or opinion on any matter related to the conditions or compensation of public employment or their betterment, so long as this is not designed to and does not interfere with the full faithful

and proper performance of the duties of employment or circumvent
the rights of the exclusive representative.

Minn. Stat. § 179A.06, subd. 1.

Under PELRA, unions are permitted, but not required, to assess fair share

fees to non-members.  Minn. Stat. § 179A.06, subd 3.

### 3.      The Individual Providers of Direct Support Services Representation Act

On May 24, 2013, Defendant Governor Mark Dayton signed the Individual

Providers of Direct Support Services Representation Act (the "Act").  2013 Minn.

Law Ch. 128, Art. 2, <u>codified at</u> Minn. Stat. §§ 179A.54, 256B.0711.  The Act

provides that, "[f]or the purposes of [PELRA], individual [homecare] providers

shall be considered . . . executive branch state employees. . . .  This section does

not require the treatment of individual providers as public employees for any

other purpose."  Minn. Stat. § 179A.54, subd. 2; <u>see also</u> Minn. Stat. §§ 179A.54,

subd. 1(b); 256B.0711, subd. 1(d).

If an exclusive representative is certified under the procedures set forth in

PELRA, the State and exclusive representative's "mutual rights and obligations .

. . to meet and negotiate regarding terms and conditions shall extend to[:]"

"compensation rates, payment terms and practices, and any benefit terms;"

"required orientation programs;" "relevant training and educational opportunities;" "the maintenance of a public registry of individuals who have consented to be included;" and "other appropriate terms and conditions of employment governing the workforce of individual providers."  Minn. Stat. § 179A.54, subd. 3; § 256B.0711, subd. 4(c).  If a contract results from the negotiations, it must be approved or disapproved by the legislature.  Minn. Stat. § 179A.54, subd. 5; § 256B.0711, subd 4(d).

> No provision of any agreement reached between the state and any exclusive representative of individual providers. . . shall interfere with the rights of participants or participants' representatives to select, hire, direct, supervise, and terminate the employment of their individual providers; to manage an individual service budget regarding the amounts and types of authorized goods or services received; or to receive direct support services from individual providers not referred to them through a state registry.

Minn. Stat. § 179A.54, subd. 4.

Any employee organization wishing to represent homecare providers may seek exclusive representative status under PELRA.  Minn. Stat. § 179A.54, subd. 10.  The appropriate unit is defined as "individual providers who have been paid for providing direct support services to participants within the previous 12 months."  Id.

6

### 4.    The Election

On June 30, 2014, the United States Supreme Court issued its decision in

<u>Harris v. Quinn</u>, 134 S. Ct. 2618 (2014).  The Court held that it was a violation of

the First Amendment for the State of Illinois to require homecare providers to

pay fair share fees to a union representative.  <u>Id.</u> at 2644.

On July 8, 2014, Defendant SEIU Healthcare Minnesota ("SEIU")

submitted an official petition to BMS requesting an election to certify it as the

exclusive representative for Minnesota homecare providers.  (Am. Compl. ¶ 31;

State Def. Ans. ¶ 25; SIEU Ans. ¶ 31.)

On August 1, BMS started the election by mailing ballots to the

approximately 27,000 providers who are eligible to vote.  (Am. Compl. ¶¶ 31-32;

State Def. Ans. ¶ 25; SEIU Ans. ¶¶ 31-32.)  On August 26, 2014, BMS tabulated

the ballots and certified SEIU as the exclusive representative.  (<u>Id.</u>)  <u>See also</u>

Minn. Stat. § 179A.12, subd. 10.

### 5.    Plaintiffs

Plaintiffs are nine persons who provide in-home care to a son or daughter

with disabilities in Minnesota.  The family members to whom Plaintiffs provide

care are participants in State Medicaid programs that pay for in-home care and

other services that allow persons with disabilities to live in their homes instead of in institutions.  Plaintiffs do not want SEIU to be their certified exclusive representative.  (See Am. Compl. ¶¶ 4-13, 33.)  Under Minnesota law, Plaintiffs are "individual provider[s]," defined as "individual[s] selected by and working under the direction of a participant in a covered program, or a participant's representative, to provide direct support services to the participant."  Minn. Stat. § 256B.0711, subd. 1(d).

## B.   Procedural History

On July 28, 2014, Plaintiffs filed a Complaint in this Court against Governor Mark Dayton; BMS Commissioner Josh Tilsen; DHS Commissioner Lucinda Jesson; and SEIU.  Emily Johnson Piper, the current DHS Commissioner, was automatically substituted for Jesson under Federal Rule of Civil Procedure 25(d).  Dayton, Tilsen, and Piper are collectively referred to as the "State Defendants."

The Complaint asserted Count I: State certification of an exclusive representati[ve] for Individual Providers will violate 42 U.S.C. § 1983 and the United States Constitution; Count II: Subjecting Plaintiffs' First Amendment rights to a majority vote violates 42 U.S.C. § 1983 and the United States

Constitution; and Count III: Compulsory financial support for an exclusive representative will violate 42 U.S.C. § 1983 and the United States Constitution.

On July 30, Plaintiffs filed a Motion for an Expedited Preliminary Injunction, requesting that the Court enjoin Defendants from implementing or enforcing the Act.  The motion was based on Counts I and II of the Complaint. Specifically, Plaintiffs requested that the Court enjoin Defendants from conducting the certification election and from certifying SEIU as the exclusive representative of Plaintiffs and other individual providers.  On August 20, 2014, this Court issued an Order denying Plaintiffs' motion.  [Docket No. 50]; Bierman v. Dayton, No. Civ. 14-3021 (MJD/LIB), 2014 WL 4145410 (D. Minn. Aug. 20, 2014).  The Court denied the motion as to Count I because the claim was unripe and premature.  The Court denied the motion as to Count II as unlikely to succeed on the merits.

As previously noted, on August 26, 2014, BMS tabulated the election results and certified SEIU as the exclusive representative.  On September 2, Plaintiffs filed an Amended Complaint against the same Defendants, asserting: Count I: State certification of an exclusive representati[ve] for individual providers will violate 42 U.S.C. § 1983 and the United States Constitution; and

Count II: Subjecting Plaintiffs' First Amendment rights to a majority vote violates

42 U.S.C. § 1983 and the United States Constitution.  On August 27, 2014,

Plaintiffs' filed a Motion to Renew Their Motion for an Expedited Preliminary

Injunction based solely on Count I of the Amended Complaint.  [Docket No. 52]

On October 22, 2014, the Court denied the renewed motion for a preliminary

injunction on the grounds that Plaintiffs were unlikely to prove an infringement

of their First Amendment Rights.  [Docket No. 69]; Bierman v. Dayton, No. Civ.

14-3021 (MJD/LIB), 2014 WL 5438505, at *9 (D. Minn. Oct. 22, 2014).  Plaintiffs

appealed the denial of their renewed motion, and the Eighth Circuit Court of

Appeals dismissed the appeal as moot because the State had already conducted

the election and certified the union.  Bierman v. Dayton, 817 F.3d 1070 (8th Cir.

2016).

On March 11, 2015, the Minnesota Legislature was informed that

Minnesota Management and Budget and DHS had reached an agreement with

SEIU for the period July 1, 2015 through June 30, 2017.  (Garcia Decl., Ex. C.)

Under the collective bargaining agreement ("CBA") providers would receive a

minimum wage of $11 per hour and paid time off, a new orientation program

was established, a grievance procedure was established, and an online registry

would be developed to match providers and clients.  (Id. at 4.)  The CBA did not

require nonmembers of the union to pay any dues or fees.  (Garcia Decl., Exs. B-

C.)  The Minnesota legislature ratified the CBA.  On May 22, 2015, Governor

Dayton signed the bill ratifying the CBA and increasing funding for the State's

homecare programs.  (Garcia Decl. ¶ 2.)  2015 Minn. Law Ch. 71, Art. 7 §§ 52-53.

Defendants have now filed a motion for judgment on the pleadings on the

grounds Plaintiffs lack standing and that Plaintiffs fail to state a claim upon

which relief may be granted.

## III.    STANDING

### A.    Standing Standard

"[N]o principle is more fundamental to the judiciary's proper role in our

system of government than the constitutional limitation of federal-court

jurisdiction to actual cases or controversies.  One element of the case-or-

controversy requirement is that plaintiffs must establish that they have standing

to sue."  Clapper v. Amnesty Int'l USA, 133 S. Ct. 1138, 1146 (2013) (citations

omitted).  "The law of Article III standing, which is built on separation-of-powers

principles, serves to prevent the judicial process from being used to usurp the

powers of the political branches."  Id. (citations omitted).  "To show Article III

standing, a plaintiff has the burden of proving: (1) that he or she suffered an

11

injury-in-fact, (2) a causal relationship between the injury and the challenged

conduct, and (3) that the injury likely will be redressed by a favorable decision."

S.D. v. U.S. Dept. of Interior, 665 F.3d 986, 989 (8th Cir. 2012) (citations omitted).

### B.  Standing Discussion

Defendants argue that Plaintiffs lack standing because their associational

rights have not, in fact, been infringed, so Plaintiffs lack a judicially cognizable

injury.

The Court rejects Defendants' invitation to decide the merits of the case

within a standing analysis.  "[S]tanding in no way depends on the merits of the

plaintiff's contention that particular conduct is illegal.  It is crucial . . . not to

conflate Article III's requirement of injury in fact with a plaintiff's potential

causes of action, for the concepts are not coextensive."  Hutterville Hutterian

Brethren, Inc. v. Sveen, 776 F.3d 547, 554 (8th Cir. 2015) (citations omitted).

Plaintiffs claim that they are injured by the fact that SEIU has been certified

as the exclusive representative for their bargaining unit.  The alleged injury to

their First Amendment freedom of association is caused by the State's

certification.  Finally, a favorable decision by this Court, barring certification

would address the alleged injury.  The Court concludes that Plaintiffs have

standing to assert their claims set forth in the Amended Complaint.

## IV.    MOTION FOR JUDGMENT ON THE PLEADINGS

### A.    Standard for Motion for Judgment on the Pleadings

"A motion for judgment on the pleadings will be granted only where the moving party has clearly established that no material issue of fact remains and the moving party is entitled to judgment as a matter of law." Waldron v. Boeing Co., 388 F.3d 591, 593 (8th Cir.2004) (citation omitted).  The Court "accept[s] all facts pled by the nonmoving party as true and draw[s] all reasonable inferences from the facts in favor of the nonmovant." Id. (citation omitted).  In deciding a motion for judgment on the pleadings, the Court considers the pleadings and "some materials that are part of the public record or do not contradict the complaint, as well as materials that are necessarily embraced by the pleadings," such as "matters of public record, orders, items appearing in the record of the case, and exhibits attached to the complaint." Greenman v. Jessen, 787 F.3d 882, 887 (8th Cir. 2015) (citations omitted).

SEIU requests that the Court take judicial notice of three documents attached to the Declaration of Kristin Garcia: 2015 Minnesota Laws Chapter 71, SF 1458 (ratifying the CBA between SEIU and the State); the CBA; and the March 11, 2015 Report to the Subcommittee on Employee Relations, Legislative Coordinating Commission, State of Minnesota (summarizing terms of the CBA).

13

([Docket No. 96] Garcia Decl., Exs. A-C.)  Plaintiffs do not oppose the request for judicial notice.  (Opp. Brief at 1.)

Under Federal Rule of Evidence 201(b), a "court may judicially notice a fact that is not subject to reasonable dispute because it: (1) is generally known within the trial court's territorial jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Each of the documents at issue is an official public record of the Minnesota Legislature and is relevant to the motion before the Court.  SEIU's request for judicial notice is granted.

**B.   Count 1: Whether Certification of an Exclusive Representative, Absent Fair Share Fees, Infringes Plaintiffs' First Amendment Right to Association to Petition the Government**

**a)   The Right Not to Associate**

The First Amendment guarantees each individual the right to associate for expressive purposes, including a right to associate for purposes of petitioning the government and influencing public policy.  See Citizens Against Rent Control v. City of Berkeley, 454 U.S. 290, 294-95 (1981).  "[P]olitical association is speech in and of itself," because "[i]t allows a person to convey a message about some of his or her basic beliefs."  Republican Party of Minn. v. White, 416 F.3d 738, 762 (8th Cir. 2005) (en banc).  And the "[f]reedom of association . . . plainly

14

presupposes a freedom not to associate."  Knox v. Serv. Employees Int'l Union, Local 1000, 132 S. Ct. 2277, 2288 (2012) (citation omitted).

### b)   Whether Exclusive Representation Compels Association

Plaintiffs assert that State certification of an exclusive representative for homecare providers affiliates Plaintiffs with SEIU's petitioning, speech, and policy positions.  They raise substantially the same arguments that they did in support of their renewed motion for an expedited preliminary injunction.

As the Court previously explained, although SEIU has been certified as the exclusive representative, Plaintiffs are not forced to associate with SEIU.  They are not required to join SEIU.  See Minn. Stat. § 179A.06, subd. 2.  They are not required to financially contribute to SEIU.  They remain free to petition the State on all issues related to the homecare programs and to vociferously criticize SEIU. See Minn. Stat. § 179A.06, subd. 1; Minn. Stat. § 179A.54, subd. 2.

Simply because the State has chosen to listen to SEIU on issues that are related to Plaintiffs' employment does not mean that Plaintiffs are being forced to associate with SEIU.  Instead, as the Supreme Court recognized in Minnesota State Board for Community Colleges v. Knight, the State of "Minnesota has simply restricted the class of persons to whom it will listen in its making of

policy." 465 U.S. 271, 282 (1984). In this case, the State has chosen to listen to the

entity that received the majority of votes in a secret-ballot election of all

individual homecare providers. Plaintiffs "have no constitutional right to force

the government to listen to their views. They have no such right as members of

the public [or] as government employees. . . ." Id. at 283. "A person's right to

speak is not infringed when government simply ignores that person while

listening to others." Id. at 288 (footnote omitted). The Supreme Court has

expressly stated that the amplification of the exclusive representative's voice

through its "unique" role in both the meet and confer and the meet and negotiate

sessions does not impair the nonmembers' First Amendment rights. Id. As in

Knight, Plaintiffs' associational freedom is not impaired because they can "form

whatever advocacy groups they like" and are "not required to become members"

of SEIU. Id. at 289.

The very system by which bargaining unit members select a PELRA

exclusive representative through majority vote makes clear that not all

bargaining unit members necessarily support the representative's positions. See

Knight, 465 U.S. at 276 ("The State Board considers the views expressed by the

state-wide faculty 'meet and confer' committees to be the faculty's official

collective position.  It recognizes, however, that not every instructor agrees with the official faculty view on every policy question.") (addressing PELRA).  Not only does the Act itself permit Plaintiffs to voice opinions directly to the State, but also, established Supreme Court precedent holds that bargaining unit members are free to criticize the positions of their union representative and make clear that they disagree with its positions.  See Abood v. Detroit Bd. of Educ., 431 U.S. 209, 230 (1977); City of Madison, Joint Sch. Dist. No. 8 v. Wis. Employment Relations Comm'n, 429 U.S. 167, 176 n.10 (1976).  There is no violation of Plaintiffs' First Amendment associational rights when they "are free to associate to voice their disapproval of [SEIU's] message; nothing about the statute affects the composition of [any group formed by Plaintiffs] by making group membership less desirable."  Rumsfeld v. Forum for Academic & Institutional Rights, Inc., 547 U.S. 47, 69-70 (2006).  Nor does Mulhall v. UNITE HERE Local 355 require a different conclusion.  618 F.3d 1279, 1287 (11th Cir. 2010).  Mulhall only addressed standing, not the merits of the employee's claim, and only addressed a Labor Management Relations Act claim, not a First Amendment claim.  Id. at 1286.

The Court remains mindful of its role as a federal court being asked to interfere with a state's policy decision of how to gather information in order to make Medicaid policy.  The Supreme Court recognized the "federalism and separation-of-powers concerns [that] would be implicated in the massive intrusion into state . . . policymaking that recognition of the claimed right [to be listened to by the government] would entail."  Knight, 465 U.S. at 285.

Despite Plaintiffs' continued insistence, cases such as Hurley v. Irish-American Gay, Lesbian & Bisexual Grp. have no application here.  515 U.S. 557, 560 (1995).  Hurley involved state action forcing a private party to alter its expressive activity to include a viewpoint with which it disagreed.  Here, the State does not require Plaintiffs to allow SEIU to participate in Plaintiffs' own speech or other expressive activity.  Plaintiffs are free to speak to and petition the State on all issues, whether individually or as part of some group other than SEIU.

Similarly, Plaintiffs are not required to display particular messages on their personal property.  Cf. Wooley v. Maynard, 430 U.S. 705, 713, 717 (1977) (holding that state may not require citizens to display ideological message on his private property in the manner of a license plate stating "Live Free or Die");

18

Miami Herald Pub. Co. v. Tornillo, 418 U.S. 241, 256, 258 (1974) (holding that a

Florida statute requiring newspapers to grant political candidates equal space to

answer criticism in the newspaper was unconstitutional, even though "the

statute in question here has not prevented the Miami Herald from saying

anything it wished").  And the State is not requiring Plaintiffs to join SEIU,

financially support SEIU, or otherwise associate with SEIU as a condition of

continuing their relationship with the State.  Cf. O'Hare Truck Serv., Inc. v. City

of Northlake, 518 U.S. 712, 716, 726 (1996) (addressing whether termination of a

government contractor based on its refusal to actively politically support election

campaign violated the First Amendment); Branti v. Finkel, 445 U.S. 507, 517, 520

(1980) (holding First Amendment prohibits discharge of assistant public

defenders "solely for the reason that they were not affiliated with or sponsored

by the Democratic Party"); Elrod v. Burns, 427 U.S. 347, 355-56, 373 (1976)

(addressing whether political patronage dismissals violated freedom of

association when plaintiffs were fired from their jobs unless they took active

steps to support the victorious political party; they "were required to pledge

their political allegiance to the Democratic Party, work for the election of other

candidates of the Democratic Party, contribute a portion of their wages to the

Party, or obtain the sponsorship of a member of the Party, usually at the price of one of the first three alternatives").

Additionally, the fact that, because it has been certified, SEIU owes a fiduciary-like duty to Plaintiffs "fairly and equitably to represent all employees . . ., union and non-union, within the relevant unit," Abood, 431 U.S. at 221, does not infringe Plaintiffs' rights.  Plaintiffs owe no corresponding duty to SEIU. Plaintiffs cite no authority for the proposition that the imposition of a legal duty on an entity impermissibly burdens the rights of the beneficiaries of that duty.  In any event, the duty of fair representation imposed on the union actually protects bargaining unit members' rights not to associate with the union.  It bars the union from discriminating against them when bargaining and administering a collective bargaining agreement.  See, e.g., Lehnert v. Ferris Faculty Ass'n, 500 U.S. 507, 556 (1991) (Scalia, J., concurring in part and dissenting in part).

Finally, the Court holds that Harris v. Quinn has no application in this case.  134 S. Ct. 2618 (2014).  In Harris, the plaintiffs did not "challenge the authority of the SEIU–HII to serve as the exclusive representative of all the personal assistants in bargaining with the State.  All they s[ought] is the right not to be forced to contribute to the union, with which they broadly disagree."  134 S.

Ct. at 2640.  The Supreme Court solely decided that it was a violation of the First

Amendment for a state to require homecare providers to pay fair share or agency

fees to a union.  Id. at 2644.  The Harris Court further made clear that a "union's

status as exclusive bargaining agent and the right to collect an agency fee from

non-members are not inextricably linked."  Id. at 2640.  Harris does not dictate a

finding for Plaintiffs by this Court.

The Court concludes that the State's certification of SEIU as the exclusive

representative under the Act and PELRA does not infringe on Plaintiffs' First

Amendment rights.  See also Jarvis v. Cuomo, No. 16-441-CV, 2016 WL 4821029,

at *1, -- F. App'x -- (2d Cir. Sept. 12, 2016); D'Agostino v. Baker, 812 F.3d 240, 245

(1st Cir. 2016); Mentele v. Inslee, No. C15-5134-RBL, 2016 WL 3017713, at *4

(W.D. Wash. May 26, 2016); Hill v. Serv. Employees Int'l Union, No. 15 CV 10175,

2016 WL 2755472, at *3 (N.D. Ill. May 12, 2016).

Because the First Amendment is not violated, the State "need not

demonstrate any special justification" for its law.  Univ. of Pa. v. EEOC, 493 U.S.

182, 201 (1990).  Count 1 is dismissed.

**C.**     **Count 2: Whether Holding an Election Regarding Whether to Certify a Union Violates the First Amendment**

In the Amended Complaint, Plaintiffs assert that "Defendants are violating Plaintiffs' First Amendment rights, as secured against state infringement by the Fourteenth Amendment . . ., by putting to a majority vote the individual right of each Plaintiff and Individual Provider to choose which organization, if any, he or she associates with for petitioning the State over its Medicaid policies." (Am. Compl. ¶ 40.) Plaintiffs argue that their First Amendment "rights may not be submitted to vote; they depend on the outcome of no elections." W. Va. State Bd. of Educ. v. Barnette, 319 U.S. 624, 638 (1943).

As the Court previously explained in ruling on Plaintiffs' motion for an expedited preliminary injunction, the Court finds no support for Plaintiffs' assertion that their constitutional rights are violated by the mere fact that a vote is occurring, which may or may not result in an action that Plaintiffs claim would violate their constitutional rights. In any case, the Court has now ruled that the certification of an exclusive representative for homecare providers did not unconstitutionally affiliate Plaintiffs with SEIU's petitioning, speech, and policy positions. Because recognition of a democratically elected PELRA representative does not infringe on Plaintiffs' First Amendment rights, holding the representative election did not infringe those rights. Either outcome of the

22

election complied with the Constitution, so there can be no violation of the First

Amendment.  Thus, Count 2 is dismissed.

Accordingly, based upon the files, records, and proceedings herein**, IT IS**

**HEREBY ORDERED**:

1. State Defendants' Motion for Judgment on the Pleadings [Docket No. 88] is **GRANTED**.

2. Defendant SEIU Healthcare Minnesota's Motion for Judgment on the Pleadings [Docket No. 92] is **GRANTED**.

3. Plaintiffs' First Amended Complaint is **DISMISSED WITH PREJUDICE**.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

Dated:   January 3, 2017                    s/ Michael J. Davis
                                            Michael J. Davis
                                            United States District Court